UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HATEM JAWAD OBAID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20 CV 1859 CDP |
| | ) | |
| KILOLO KIJAKAZI[1], | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Hatem Jawad Obaid brings this action seeking judicial review of the Commissioner's decision denying his applications for disability insurance and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, 1381.  Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), provide for judicial review of a final decision of the Commissioner.  Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, I will affirm the decision of the Commissioner.

### **Procedural History**

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff was born in 1974 and filed his applications on May 2 and 4, 2018. (Tr. 15, 329-42.)  He alleges he became disabled beginning June 13, 2017, because of heart attack, high blood pressure, high cholesterol, and shoulder, back, knee and leg problems.[2]   (Tr. 384.)  Plaintiff previously applied for disability benefits and those applications were denied in an ALJ decision dated June 12, 2017.  (Tr. 182-93.)   The relevant time period for consideration of plaintiff's Title II claim is from June 13, 2017, until December 31, 2019, the date his insured status expired.

Plaintiff's applications in this case were initially denied on July 5, 2018. (Tr. 225-30.)  After a hearing before an ALJ on September 4, 2019, and a supplemental hearing called by the ALJ on March 11, 2020, the ALJ issued a decision denying benefits on April 16, 2020.  (Tr. 15-35.)  On October 27, 2020, the Appeals Council denied plaintiff's request for review.  (Tr. 1-5.)  The ALJ's decision is now the final decision of the Commissioner.  42 U.S.C. §§ 405(g) and 1383(c)(3).

In this action for judicial review, plaintiff contends that the ALJ should have obtained a medical opinion to determine his exertional limitations when formulating his residual functional capacity (RFC).  He also argues that the ALJ improperly evaluated opinion evidence from his treating psychiatrist.  He asks that I reverse the Commissioner's final decision and remand the matter for further

---

[2] On October 16, 2019, plaintiff amended his alleged onset date to June 13, 2017.  (Tr. 362.)

evaluation.  For the reasons that follow, I will affirm the Commissioner's decision.

## Medical Records and Other Evidence Before the ALJ

With respect to the medical records and other evidence of record, I adopt plaintiff's recitation of facts (ECF #26-1) to the extent they are admitted by the Commissioner (ECF #33-2), as well as the additional facts submitted by the Commissioner (ECF #33-2) as they are not contested by plaintiff.  Additional specific facts will be discussed as needed to address the parties' arguments.

## Discussion

A.    Legal Standard

To be eligible for disability insurance benefits under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful

3

work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).

Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). "[Substantial evidence] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks and citations omitted). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole. *See*

*e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider whether a claimant's

subjective complaints are consistent with the medical evidence. *See Polaski v.*

*Heckler*, 739 F.2d 1320 (8th Cir. 1984) (listing factors such as the claimant's daily

activities, the duration, frequency, and intensity of the pain, precipitating and

aggravating factors, dosage, effectiveness and side effects of medication, and

functional restrictions).[3]  When an ALJ gives good reasons for the findings, the

court will usually defer to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696

(8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full

and fair record in the non-adversarial administrative proceeding. *Hildebrand v.*

*Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

B.    ALJ's Decision

In his written decision, the ALJ found that plaintiff had not engaged in

substantial gainful activity since June 25, 2015.  (Tr. 18.)  The ALJ found that

---

[3] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.  However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record." *See* SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Lawrence v. Saul*, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

plaintiff had the following severe impairments: bilateral knee osteoarthritis,

coronary artery disease, left and right shoulder rotator cuff tendinopathy, panic

disorder, posttraumatic stress disorder, and major depressive disorder.  (Tr. 18.)

The ALJ found plaintiff had the non-severe impairment of gastroesophageal reflux

disease.  (Tr. 18.)  The ALJ determined that plaintiff's impairments or combination

of impairments did not meet or medically equal a listed impairment in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (Tr. 18.)  The ALJ found plaintiff to have the

residual functional capacity (RFC) to perform light work with the following

limitations:

> [Claimant can] lift up to 20 pounds occasionally; lift/carry up to 10
> pounds frequently.  He can stand/walk for about 6 hours and sit for up
> to 6 hours in an 8 hour workday, with normal breaks.  He can
> occasionally climb ramps or stairs, but never climb ladders, ropes, or
> scaffolds.  He can occasionally balance, stoop, kneel, crouch, and
> crawl.  He can occasionally overhead reach using the bilateral upper
> extremities.  He should avoid exposure to excessive vibration.  He
> should avoid exposure to operational control of moving machinery,
> unprotected heights and exposure to hazardous machinery.  His work
> should be limited to simple and routine tasks.  He should have
> occasional interaction with the public, co-workers and supervisors.
> His work should not be in a fast production type of job.

(Tr. 20.)  The ALJ relied upon vocational expert testimony to support a conclusion

that plaintiff could not perform his past relevant work as a truck driver, but that

that there were significant jobs in the economy of office helper, collator operator,

and photocopy machine operator that plaintiff could perform.  (Tr. 34.)  The ALJ

therefore found plaintiff not to be disabled.  (Tr. 35.)

Plaintiff claims that this decision is not supported by substantial evidence

because the ALJ should have obtained a medical opinion on his exertional

limitations and should have properly evaluated the opinion of his treating

psychiatrist on his non-exertional limitations to determine his RFC.

C.    RFC

Plaintiff argues that the ALJ should have obtained a medical opinion which

addressed how his exertional limitations affected his ability to function in the

workplace before fashioning his RFC.  RFC is defined as "what [the claimant] can

still do" despite his "physical or mental limitations."  20 C.F.R. § 404.1545(a).  The

ALJ must determine a claimant's RFC based on all of the relevant evidence,

including the medical records, observations of treating physicians and others, and

an individual's own description of his limitations.  *McKinney v. Apfel*, 228 F.3d

860, 863 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir.

1995)).

On July 5, 2018, Renu Debroy, M.D., an agency medical consultant,

reviewed plaintiff's records and opined that plaintiff's physical impairments were

non-severe as his labs, x-rays, and examinations were all relatively normal.  (Tr.

209.)  The ALJ found the opinion was not persuasive based upon additional

medical evidence received at the hearing, which demonstrated that plaintiff had both severe mental and physical impairments.  (Tr. 32.)  The ALJ went on to fashion a more restrictive RFC based upon these additional limitations.  (Tr. 32.) According to plaintiff, the ALJ erred by improperly substituting his own independent medical findings for that of a medical source when fashioning his RFC.

Here, the ALJ properly formulated plaintiff's RFC only after evaluating his subjective symptoms and discussing the relevant evidence, including his testimony, the medical evidence, and his daily activities.  After consideration of all this evidence, the ALJ concluded that plaintiff retained the capacity to perform light work, with significant modifications tailored to his credible limitations.  In so doing, he did not substantially err.

Plaintiff incorrectly argues that the ALJ's RFC is not supported by substantial evidence unless there is a medical opinion which addresses his specific functional limitations.  Although the RFC is a medical question and must be supported by some medical evidence, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).   Instead, the RFC must be determined by the ALJ based on all the relevant evidence, and the ALJ properly evaluated Dr. Debroy's opinion, along with all the relevant medical evidence, using the new regulations applicable to

plaintiff's claim. *See* 20 C.F.R. § 416.920c(a) (2017) (when evaluating claims filed March 27, 2017, or later, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."). "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Winn v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 982, 987 (8th Cir. 2018) (internal quotation marks and citation omitted); *See* 20 C.F.R. § 416.920b(c)(1)-(3) (2017) (statements on issues reserved to the Commissioner, such as statements that a claimant is or is not disabled, are deemed evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled.").

While the ALJ does have a duty to fully and fairly develop the record, the ALJ is not required to obtain additional medical evidence if the evidence of record provides a sufficient basis for the ALJ's decision. *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011).   Moreover, it is ultimately plaintiff's burden to establish his RFC, and he failed to carry this burden by producing any evidence that his RFC should be more limited because of his heart, shoulder, knee, back, and wrist issues. *See Hensley*, 829 F.3d at 932.  Plaintiff did not provide the ALJ with any medical opinion which addressed functional limitations caused by his rotator cuff

tendinopathy, bilateral knee osteoarthritis, wrist and back pain, or coronary artery disease.

Here, the ALJ relied on the objective medical evidence of record regarding plaintiff's shoulder, knee, wrist, back, and heart issues, which he specifically considered and factored into his evaluation of plaintiff's RFC.  To account for plaintiff's credible limitations with respect to his knees, shoulders and heart, the ALJ limited plaintiff to light exertional work prohibiting him from climbing ladders, ropes, and scaffolds, and only occasionally reaching overhead, balancing, stooping, kneeling, crouching and crawling, and prohibiting him from exposure to stated environmental factors.  These limitations are consistent with his conservative treatment and numerous examinations which yielded normal (or at most slightly abnormal) results.

Although plaintiff suffered a heart attack prior to his alleged onset date, plaintiff did not have significant resulting limitations and was instructed by his cardiologist to reduce his statin medications.  (Tr. 24, 28-29, 31, 563, 629, 852-53.) Plaintiff had regular visits with cardiologist Steven Lavine, M.D.  Examination results on September 18, 2017, showed normal blood pressure, normal carotid upstrokes, no neck vein distention, normal thyroid, chest clear to auscultation and percussion, no third or fourth heart sound, no A2 increase, no masses, grossly intact cranial nerves, normal motor strength, normal gait, intact cognition, sinus

11

rhythm with minimal widening of the QRS, and normal results following an exercise echocardiogram. (Tr. 581-82, 565-66.) Despite his repeated complaints of pain, plaintiff's cardiovascular examinations by Dr. Lavine yielded normal results on October 19, 2017 (Tr. 565-66), January 17, 2018 (Tr. 563-64), February 28, 2018 (Tr. 561-62), May 7, 2018 (Tr. 559-60), June 11, 2018 (Tr. 771), August 21, 2018 (Tr. 773), September 17, 2018 (Tr. 776), and October 17, 2018 (Tr. 778.) During plaintiff's examination on January 2, 2019, Dr. Lavine confirmed that plaintiff was taking too many medications and that "with regard to cardiovascular diseases, his stress testing including his MPI are completely normal." (Tr. 787.) On April 3, 2019, Dr. Lavine assured plaintiff that his complaints "are unlikely to be related to the heart. [Plaintiff] does not have exertional discomfort." (Tr. 794.) Plaintiff's physical examination yielded normal results. (Tr. 794-95.)

On August 22, 2019, Dr. Lavine noted that plaintiff returned to the office "once again" with the "same complaints" of pain. (Tr. 911.) Dr. Lavine noted that plaintiff had recent hospital and urgent care visits but that his chest x-rays, EKG, and blood work were all normal. (Tr. 911.) Plaintiff did not complain of pain with exertion and denied syncope, claudication, or palpitations. (Tr. 911.) Physical examination showed normal heart and chest results, with no edema. (Tr. 911-12.) Dr. Lavine noted that plaintiff's "complaints have occurred again and once again, we are going to have to decide if it is going to be ischemic or nonischemic." (Tr.

912.)  On September 18, 2019, Dr. Lavine reported that plaintiff was "doing quite well."  (Tr. 914.)  Plaintiff had a nuclear stress test which showed a minimal apical perfusion defect.  (Tr. 914.)  His ejection fraction was within normal limits at 58%.  (Tr. 914.)   Once again physical examination showed normal results, although plaintiff's symptoms were unchanged.  (Tr. 914-15.)  Dr. Lavine requested plaintiff see an orthopedic doctor about his radiating shoulder pain.  (Tr. 915.)  Plaintiff's medications were continued and the possibility of future cardiac catheterization was discussed, although Dr. Lavine noted that "I do not think at this point it is a useful thing to get."  (Tr. 915.)

Plaintiff's cardiovascular examinations by primary care physician Joseph W. Moleski, D.O., yielded repeated, similar results of normal heart rate and rhythm, normal heart sounds and lungs clear to auscultation on May 1, 2017, June 22, 2017, August 29, 2017, December 1, 2017, December 15, 2017, January 23, 2018, March 9, 2018, April 10, 2018, and May 7, 2018.  (Tr. 620-21, 622-23, 630-31, 636-37, 642-43, 646-47, 654-55, 657-58, 746.)

Plaintiff's cardiac examinations were also observed to be within normal limits by Alexander Meyer, D.O., who noted that plaintiff first saw him on September 10, 2018 to establish care and to apply for social security benefits.  (Tr. 707.)  Plaintiff's primary complaints were knee pain and depression.  (Tr. 708.) Plaintiff's lungs were clear with no wheezes, rhonchi, or rales, and his S1 and S2

13

sounds were normal, with no heart murmurs and regular rate and rhythm.  (Tr. 707.)  Physical examinations by Dr. Meyer on December 14, 2018, December 20, 2018, February 13, 2019, and March 19, 2019 were within normal limits.  (Tr. 713, 716, 721, 732.)  Plaintiff was seen by Dr. Meyer's colleague, Mark Walsma, M.D., on August 14, 2019, complaining of chronic chest and back pain which plaintiff was "certain" was related to his heart.  (Tr. 849.)  Upon examination, Dr. Walsma observed plaintiff's lungs were clear and symmetric, he had regular heart rhythm, with normal peripheral perfusion, and showed no acute distress.  (Tr. 849.)  Plaintiff was advised that his EKG was clear and was referred back to his primary care physician with no need for acute evaluation.  (Tr. 850.)

Plaintiff was seen the following week by Dr. Meyer, who advised him that his pain could be statin myopathy.  (Tr. 853.)  Dr. Meyer discussed reducing the dosage of his statin but plaintiff said he was hesitant to do so.  (Tr. 853.)  Physical examination was within normal limits.  (Tr. 853.)  Plaintiff's reports of pain in his shoulders, elbows, chest wall, thighs, and knees were noted to be "out of proportion with exam."  (Tr. 853.)  Dr. Meyer also found plaintiff's examinations results to be within normal limits on October 22, 2019 and February 3, 2020, (Tr. 893-94, 1305.)  Plaintiff was seen by Dr. Meyer's colleague, Edward Chen, M.D., on December 13, 2019, for complaints of hemorrhoids.  (Tr. 905.)  He reported no complaints of chest pain, palpitations, or leg swelling.  (Tr. 905.)  Upon

examination, plaintiff was observed to have normal heart rate and regular rhythm, normal heart sounds, normal pulmonary effort and breath sounds, and no respiratory distress.  (Tr. 906.)

Plaintiff had similar routine, conservative treatment with examinations within normal (or at most slightly abnormal) limits for his knee, wrist, shoulder, and back/neck pain.  Plaintiff reported knee pain on February 20, 2018, complaining of worse pain in his right knee, swelling, instability, and morning stiffness.  (Tr. 512.)  Physical examination showed no pain with hip rotation, normal gait, negative straight leg raise test in both legs, effusion with tenderness of the medial joint line, negative Lachman test, grade 0 varus and valgus laxity with grade 0 posterior sag, and a range of motion from 0 to 110 degrees with no significant pain.  (Tr. 514.)  The extensor mechanism was intact with no palpable gap in the patellar and quadriceps tendons.  (Tr. 514.)  The patellar tracked well with negative apprehension test.  (Tr. 514.)  Plaintiff had full strength in his quadriceps with no atrophy present, intact EHL/FHL/GS/AT, and intact sensation, no erythema, minimal crepitus, and no warmth to the touch.  (Tr. 514.)  X-rays revealed normal bone density, intact osseous structures with no acute fractures or dislocation, and small bilateral effusions.  (Tr. 508.)  Impression was bilateral knee osteoarthritis.  (Tr. 514.)  Plaintiff was given no restrictions based on his diagnosis.

(Tr. 514.)  He declined physical therapy and was recommended conservative interventions of vitamins and over the counter supplements.  (Tr. 514.)

On March 9, 2018, Dr. Moleski administered bilateral knee injections to treat plaintiff's osteoarthritis.  (Tr. 623.)  On April 10, 2018, plaintiff told Dr. Moleski that the injections improved his pain but that pain had returned to his right knee.  (Tr. 619.)

Plaintiff did not seek treatment for knee pain again until September 10, 2018, when he sought and obtained bilateral knee injections from Dr. Meyer.  (Tr. 704-08.)  On October 18, 2018, plaintiff told Dr. Meyer that "he has been [in] a much better mood recently since his knees have improved in terms of the pain [he] is having after the steroid injections.  He has been able to start working again and is able to provide for his family once again."  (Tr. 709.)  Plaintiff sought no further treatment for his knee problems.[4]

Plaintiff saw Lauren E. Smith, PA, for left shoulder pain on February 16, 2018.  (Tr. 509.)  He stated that he had shoulder pain since stent placement in 2016.  (Tr. 509.)  Examination revealed good range of motion in neck, no active skin lesions or dyskinesis in either shoulder, but rotator cuff insertion, AC joint,

---

[4] Plaintiff does not challenge the ALJ's finding that his gastrointestinal symptoms, which improved with medication and diet modifications, were non-severe.  (Tr. 709, 712, 780, 789, 789, 1304-05.)  Nor does plaintiff contend that his vertigo, which he testified about at his first hearing before the ALJ, constitutes a severe impairment as there is no indication in his medical records that plaintiff ever sought treatment for vertigo.  (Tr. 135-36.)

and periscapular and long head biceps tenderness to touch in both arms.  (Tr. 511.)

Plaintiff had unrestricted passive range of motion and restricted active range of

motion (170 degrees elevation) in both shoulders.  (Tr. 511.)  Plaintiff had 4/5

abduction strength, no sulcus sign, no evidence of generalized ligamentous laxity,

negative anterior apprehension, negative relocation test, negative O'Brien's test,

and positive rotator cuff impingement in both shoulders.  (Tr. 511.)  Impression

was left and right rotator cuff tendinopathy and cervicalgia.  (Tr. 511.)

Conservative treatment of icing, physical therapy exercises, and anti-inflammatory

medications were recommended.  (Tr. 511.)  Plaintiff was advised to get a shoulder

injection but he refused.  (Tr. 511.)

Plaintiff reported chest and shoulder pain to Dr. Lavine on June 11, 2018.

(Tr. 770.)  Dr. Lavine noted that "a previous exercise echo was completely

normal."  (Tr. 770.)   Physical examination was normal, with Dr. Lavine

suggesting plaintiff's symptoms could be related to reflux.  (Tr. 771.)  His

medications were changed but no other recommendations were made.  (Tr. 771.)

During his initial visit to establish care, plaintiff reported to Dr. Meyer on

September 10, 2018 that he had experienced shoulder pain since stent placement.

(Tr. 704.)  Physical examination was normal and revealed no edema in extremities,

normal peripheral pulses, no joint swelling, and normal range of motion.  (Tr. 707.)

Dr. Meyer made no assessment of plaintiff's shoulder.  (Tr. 707.)

17

Plaintiff fell in February of 2019 and fractured his right wrist and shoulder. (Tr. 684, 692.)  Dale E. Doerr, M.D., orthopedist, diagnosed plaintiff with a closed nondisplaced fracture of the greater tuberosity of the right humerus and placed plaintiff in a short arm cast.  (Tr. 682.)  During his February 13, 2019, visit with Dr. Meyer, plaintiff reported pain from his fall from slipping on ice.  (Tr. 718.) Physical examination revealed short arm cast on the right arm, inability to lift shoulder to over 100 degrees in abduction or flexion, mild tenderness to anterior should with palpation but otherwise normal results.  (721-22.)  Dr. Meyer refilled his Norco pain medication and told plaintiff to follow up with his orthopedist in six weeks to have the cast removed.  (Tr. 722.)

Plaintiff followed up with Dr. Doerr on February 26, 2019.  (Tr. 683.)  He reported "doing relatively well" in the cast but complained of right shoulder pain. (Tr. 683.)   X-rays of the shoulder showed an impaction fracture of the greater tuberosity, minimally displaced, and x-rays of the wrist showed that the fracture of the distal radius appeared to be healing in acceptable position and alignment.  (Tr. 684.)  Dr. Doerr started plaintiff on gentle pendulum exercises for his right shoulder and continued his cast for another two weeks.  (Tr. 684.)  Plaintiff called Dr. Doerr's office on March 15, 2019, seeking a Norco refill.  (Tr. 690.)  He was told to try Tylenol instead.  (Tr. 690.)

18

Four days later, plaintiff complained of continuing pain in his wrist and shoulder to Dr. Meyer, who noted that plaintiff's "pain is out of proportion with exam." (Tr. 732.)  X-rays revealed that plaintiff's fractures healed with conservative treatment.  (Tr. 684.)  Plaintiff was assessed with routine healing of his right wrist and referred to physical therapy for his shoulder.  (Tr. 732.)  Plaintiff sought additional Norco, claiming that "is the main thing that helps control his pain."  (Tr. 731.)  His prescription was renewed.  (Tr. 732.)

During his April 3, 2019 visit with Dr. Doerr, plaintiff stated that he was "doing better" but still had shoulder pain.  Physical examination and x-rays showed a good range of motion in the right wrist, with no tenderness and the ability to make a fist, and an improving range of motion in the right shoulder of 125 degrees of forward flexion, 110 degrees of abduction, external rotation to 70 degrees, internal rotation to 80 degrees, and tenderness at the rotator cuff and greater tuberosity with range of motion.  (Tr. 877.)  Dr. Doerr recommended plaintiff continue with physical therapy and a follow-up in four weeks.  (Tr. 878.)  At his May 7, 2019 follow up visit, plaintiff complained of numbness in his thumb and little finger, as well as right shoulder pain.  (Tr. 883.)  Physical examination of the right wrist revealed "questionable tenderness over the distal radius" with a full range of motion and no tenderness with motion.  (Tr. 884.)  Physical examination of the right shoulder revealed almost full range of motion (160 degrees forward

flection and abduction, external rotation to 80 degrees, and internal rotation to 90 degrees) and mild tenderness with motion.  (Tr. 884.)  Impression was the fractures were healed with possible right rotator cuff tear.  (Tr. 884.)  Dr. Doerr recommended an MRI, but plaintiff rejected this suggestion, claiming claustrophobia.  (Tr. 884.)  An ultrasound of the right shoulder was ordered instead.  (Tr. 884.)  The ultrasound revealed a 3 x 3 cm tear of the supraspinatus and the anterior infraspinatus tendons with mild retraction and borderline fatty infiltration of the muscles.  (Tr. 888.)

As a result, Dr. Doerr recommended surgical repair of his rotator cuff during the follow-up visit on May 23, 2019.  (Tr. 888.)  Plaintiff stated that he was "leaving for Jordan and does not wish to have this done."  (Tr. 888.)  Instead, plaintiff obtained a cortisone injection in the right subacromial bursa and stated he would seek follow-up care when he returned from Jordan.  (Tr. 888.)

Plaintiff complained of shoulder, back, and chest pain to Dr. Meyer during his October 22, 2019 visit, as well as pain in his abdomen.  Physical examination showed plaintiff's neck was supple, with no cervical adenopathy or thyromegaly, and no edema in his extremities with normal peripheral pulses.  (Tr. 893.)  Plaintiff's medications were changed and the notation was made to evaluate him for an autoimmune condition.  (Tr. 893.)

Plaintiff returned for a follow-up visit with Dr. Doerr on November 1, 2019, complaining of pain in his left shoulder and neck, which radiates down his left arm to the hand.  Plaintiff stated that his right shoulder was still giving him "some difficulties, but not nearly as bad as the left." (Tr. 977.)  Physical examination showed normal alignment of the left shoulder and a decreased range of motion in both shoulders to about 160 degrees of forward flexion, 150 degrees of abduction, external rotation to about 80 degrees, and internal rotation to about 70 degrees bilaterally.  (Tr. 978.)   Dr. Doerr noted tenderness on the extremes of motion, decreased strength in both shoulders with the left shoulder being weaker than the right, tenderness with strength measurements, a positive Hawkins test and Neer's test, negative internal derangement test, negative relocation test, and negative apprehension test bilaterally.  (Tr. 978.)  Plaintiff had a decreased range of motion in the cervical spine.  (Tr. 978.)  X-rays showed no evidence of fracture, dislocation, or other acute bony abnormality in the left shoulder, although some mild acromioclavicular joint osteoarthritis was noted.  (Tr. 978.)  Impression was left shoulder pain, right rotator cuff tear, and neck pain.  (Tr. 978.)  Dr. Doerr administered a cortisone shot into the left subacromial bursa and referred him to a doctor for his neck pain.  (Tr. 978.)

Plaintiff saw Ashok Kumar, M.D., for his neck pain on November 14, 2019.  (Tr. 980.)  He told Dr. Kumar he had not had any physical therapy.  (Tr. 980.)

Plaintiff did not report any major pain which would start from the neck and radiate all the way down into his upper extremities or any major tingling, numbness, weakness, or neurological complaints.  (Tr. 980.)  Physical examination of the cervical spine revealed localized tenderness of the left-sided cervical spine at the C7-T1 region, where he has a trigger point, mildly limited range of motion on forward flexion and extension, 25 to 30 percent restricted range of motion on lateral rotation and bending, and a negative Spurling's test.  (Tr. 982.)   Plaintiff had symmetrical reflexes of the biceps, triceps, and brachioradialis without any focal sensory deficits to pinwheel, decreased motor strength around the left-sided shoulder region with complaints of pain on isolated testing of the deltoid and biceps muscles, and symmetrical distal strength at 4+ to 5/5.  (Tr. 982.)  X-rays performed in the office showed no acute abnormalities of any significant narrowing of the disc space heights in the cervical spine.  (Tr. 982.)  Plaintiff was assessed with cervicalgia, pain in left shoulder, and cervical myofascial pain syndrome and was advised to start physical therapy and use Tylenol for pain.  (Tr. 983.)

After thoroughly summarizing this evidence of plaintiff's conservative treatment, which included his repeated, normal cardiac examinations and relatively normal (or mildly abnormal) examinations and objective test results with respect to his other complaints, the ALJ formulated a restricted light work RFC based on

22

plaintiff's credible limitations of record with respect to his shoulder, knee, wrist, back, and chest pain.  Plaintiff can point to no medical evidence in the record demonstrating that any doctor ever placed any exertional limitations on his physical activities which are more limited than or inconsistent with his RFC. Although plaintiff believes that the ALJ should have assessed the medical evidence differently to support greater limitations or obtained a medical opinion which addressed how his exertional limitations affected his ability to function in the workplace before fashioning his RFC, it is not my role to reweigh the medical evidence of plaintiff's limitations considered by the ALJ in his determination of plaintiff's RFC.  *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016).  Under these circumstances, the ALJ did not err in failing to obtain a medical opinion as to plaintiff's exertional limitations before fashioning plaintiff's RFC, and his decision is entitled to deference.

The same is true with respect to the non-exertional limitations in plaintiff's RFC.  To account for plaintiff's credible limitations with respect to his panic disorder, PTSD, and major depressive disorder, the ALJ limited plaintiff to non-fast pace production work with simple and routine tasks, and only occasional interaction with the public, co-workers and supervisors.  (Tr. 33.)  Plaintiff argues that the ALJ substantially erred in his formulation of non-exertional limitations as inconsistent with the opinion of Mirela Marcu, M.D., his treating psychiatrist.

23

In January 2020, Mirela Marcu, M.D., completed a medical source statement – mental in connection with plaintiff's applications for benefits indicating that plaintiff had marked interference in his concentration, persistence, and pace; using reason and judgment to make work-related decisions; understanding and learning terms, instructions, and procedures; working a full day without needing more than the allotted number or length of rest periods; regulating emotions, controlling behavior, and maintaining wellbeing in a work setting; keeping social interactions free of excessive irritability, argumentativeness, sensitivity, or suspiciousness; and responding appropriately to requests, criticism, suggestions, corrections, and challenges.  (Tr. 933-34.)  Dr. Marcu opined that plaintiff had moderate limitations in his ability to initiate and complete tasks in a timely manner; ignore or avoid distractions; sustain an ordinary routine and regular attendance; follow one or two step oral instructions; function independently; distinguish between acceptable and unacceptable work performance; ask simple questions or request help; and maintain socially acceptable behavior.  (Tr. 933-34.)   Dr. Marcu believed that plaintiff could not perform in proximity to coworkers without being distracted or distracting them with his abnormal behavior or in contact with the public, but that he could perform in a setting where supervisors provided simple instructions for non-detailed tasks.  (Tr. 934-35.)  Dr. Marcu stated that plaintiff would be late or need to leave work early three times a month or more and that he would miss work

three or more times per month because of "anxiety, PTSD symptoms, tiredness, depression." (Tr. 935.) Dr. Marcu listed plaintiff's diagnoses as PTSD and major depressive disorder, recurrent. (Tr. 936.) When asked to list objective signs and symptoms which support her opinion, Dr. Marcu wrote "distractibility, poor memory, depression, anxiety." (Tr. 936.) She also claimed "physical illness" was a reason why plaintiff could not work. (Tr. 936.)

State agency medical consultant J. Edd Bucklew, Ph.D., reviewed plaintiff's medical records on July 5, 2018, and found that plaintiff did not have a severe mental impairment given his daily activities, lack of hospitalizations, normal physical examinations, and successful treatment with medication. (Tr. 208-10.)

Here, the ALJ properly considered the persuasiveness of the medical source evidence from Dr. Marcu and Dr. Bucklew under the new regulations by discussing the supportability and consistency of the evidence, the two most important factors required by the new regulations. *See* 20 C.F.R. § 416.920c(a)-(c) (2017) (in evaluating persuasiveness, ALJ should consider supportability, consistency, relationship with the claimant -- which includes length of the treatment relationship, frequency of examinations, examining relationship, purpose of the treatment relationship, and the extent of the treatment relationship, specialization, and other factors); 20 C.F.R. § 416.920c(b)(2) (2017) (the ALJ was required to explain how he considered the factors of supportability and

consistency, which are the two most important factors in determining the persuasiveness of a medical source's medical opinion).  The ALJ was not required to give any special significance to Dr. Marcu's opinion.  *See* 20 C.F.R. § 416.920c(a) (2017) (when evaluating claims filed March 27, 2017, or later, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources.").

In this case, the ALJ found neither opinion persuasive.  The ALJ found Dr. Bucklew's opinion not persuasive as additional medical evidence received at the hearing supported a finding that plaintiff had severe mental impairments.  The ALJ determined that Dr. Marcu's opinion was not persuasive for several reasons.  First, the ALJ considered her brief treating relationship with plaintiff.  (Tr. 33.)  At the time Dr. Marcu gave her opinion, she had only seen plaintiff twice.  (Tr. 937-38.)  Second, the ALJ found that Dr. Marcu's opinion was internally inconsistent because she opined that plaintiff had marked interference with concentration, persistence, and pace, yet she determined that he was only moderately limited in initiating and completing tasks in a timely manner, ignoring or avoiding distractions, and sustaining ordinary routine and regular attendance.  (Tr. 933.)  In addition, Dr. Marcu claimed plaintiff had a marked limitation in his ability to interact socially without irritability and respond appropriately to requests and

criticism but only a moderate limitation in asking for help and maintaining socially acceptable behavior.  (Tr. 934.)

Third, the ALJ found Dr. Marcu's opinion not persuasive as it was not supported by her own treatment notes.  (Tr. 33.)  At the two visits plaintiff had with Dr. Marcu prior to her completion of the form, plaintiff appeared pleasant with good hygiene, no abnormal movements, full affect, and logical and goal-oriented thought processes.  (Tr. 937-38.)  Dr. Marcu's notes contain no mention of distractibility or poor memory, nor do they reveal any significant clinical or diagnostic abnormalities consistent with marked limitations.  (Tr. 938-39.)

Fourth, the ALJ determined that Dr. Marcu's opinion was not persuasive as it was inconsistent with the medical records from his other medical sources, including Drs. Moleski, Lavine, and Meyer, who regularly treated plaintiff and consistently noted that he was alert and oriented with normal speech and logical and goal-oriented thought processes.   (Tr. 511, 513, 560-61, 563, 565, 582, 696, 716, 707, 721, 728-29, 732, 771-73, 776, 779, 783, 788, 790, 795, 849, 898, 906, 912, 914, 917, 1292, 1305, 1311.)  During medical visits plaintiff was described as pleasant, friendly, and cooperative.  (Tr. 511, 513, 849, 898, 906, 937-38, 1311.)  Moreover, Dr. Marcu stated that plaintiff's "physical illness" contributed to his inability to work, but she did not evaluate or treat him for any physical impairment.

Although plaintiff believes that the ALJ should have assessed Dr. Marcu's opinion differently to support greater limitations, it is not my role to reweigh the medical evidence of plaintiff's limitations considered by the ALJ in his determination of plaintiff's RFC. *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016). It is the duty of the ALJ to weigh conflicting evidence and to resolve disagreements among medical opinions. *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). Here, the ALJ did not substantially err when he found Dr. Marcu's opinion not persuasive and not consistent with, or supported by, the evidence as a whole. That evidence showed that plaintiff's mental impairments were not disabling. Inconsistent with significant social limitations, plaintiff appeared pleasant, friendly, and cooperative with normal behavior. (Tr. 19, 511, 513, 849, 898, 906, 937- 38, 1311.) There was no evidence of distractibility or memory deficits. (Tr. 19, 783.) Plaintiff consistently appeared alert and oriented. (Tr. 511, 513, 560-61, 563, 565, 582, 696, 716, 707, 721, 728-29, 732, 771-73, 776, 779, 783, 788, 790, 795, 898, 906, 912, 914, 917, 1292, 1305.) He had normal speech. (Tr. 790, 898, 937.) He retained normal cognition. (Tr. 560-61, 563, 566, 582, 771, 773, 776, 779, 788, 795, 912, 914, 917.) Plaintiff had a logical and goal-oriented thought process. (Tr. 937-38, 1311.) The state agency employee who assisted plaintiff with his applications for benefits noted no problems with his ability to understand or concentrate. (Tr. 21, 393.)

Plaintiff received behavioral health counseling from Dale Sieben, L.C.S.W., from December 2017 to June 2018.  (Tr. 23, 615, 617, 626, 628, 639, 641.)  The sessions focused on plaintiff's financial difficulties and family deaths.  (Tr. 615, 617, 626, 628, 639.)  Plaintiff did not seek specialized mental health treatment again until after the initial administrative hearing.  (Tr. 30, 938.)  Plaintiff reported improvement in his mental health symptoms with the use of medication.  (Tr. 23-25, 622, 629, 635, 704, 709-10.)  In fact, plaintiff reported improvement in his mental health and claimed he had returned to work in October 2018.  (Tr. 26, 32, 709.)

After reviewing the medical evidence as a whole, the ALJ determined that it did not support the disabling limitations claimed by Dr. Marcu and instead supported an RFC which limited plaintiff to non-fast pace production work, simple and routine tasks, and only occasional interaction with the public, co-workers and supervisors.  Such a determination does not constitute reversible error as the new regulations permit the ALJ to consider medical source evidence as appropriate. 20 C.F.R. § 416.920a(b)(1) (2017).  Ultimately, "the interpretation of physicians' findings is a factual matter left to the ALJ's authority."  *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (citing *Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir. 2005)).

In addition to evaluating the medical evidence, the ALJ formulated plaintiff's RFC after consideration of the entire record, which included an evaluation of plaintiff's subjective symptoms, his testimony, and his daily activities.  When considering a claimant's self-reported symptoms and limitations, the ALJ must evaluate whether the claimant's subjective statements are consistent with and supported by the record as a whole.  20 C.F.R. § 404.1529(c); SSR 16-3p.  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir. 2001).  I must defer to the ALJ's credibility determinations "so long as such determinations are supported by good reasons and substantial evidence."  *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).  When determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p; *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski,* 739 F.2d at 1322.  "[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not

credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record contains inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence.  *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the relevant factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

Here, the ALJ summarized plaintiff's testimony regarding his daily activities and subjective allegations of his limitations and found plaintiff's statements about the intensity, persistence, and limiting effects inconsistent with the evidence of record.  The ALJ acknowledged plaintiff's reported symptoms and went on to weigh these allegations against the evidence of record as required by 20 C.F.R. § 404.1529(c)(3).

In this case, the ALJ determined that plaintiff's allegations of disabling pain were inconsistent with his routine treatment, consisting primarily of regular doctor's appointments, therapy, and medication.  (Tr. 31.)  *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (noting that in evaluating the claimant's subjective complaints, the ALJ properly considered the claimant's pattern of conservative treatment) (citing *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998)).

31

As previously stated, although plaintiff suffered a heart attack prior to his onset date and routinely saw a cardiologist, he had no significant ongoing cardiac issues and was, in fact, told that his heart was normal and instructed to reduce his statin medication.  (Tr. 24, 28-29, 31, 563, 629, 787, 794, 852-53.)  As for his knee problems, plaintiff reported knee pain in February 2018 and received a right knee injection that he reported improved his pain.  (Tr. 619, 623, 625, 704.)  He did not seek further treatment until September 2018 when he received bilateral knee injections.  (Tr. 512, 704, 707-08.)  He subsequently reported improvement and he sought no further treatment for his knee problems.  (Tr. 709.)  Plaintiff testified to disabling vertigo, but he sought no treatment for this impairment during the relevant period. (Tr. 120, 128, 135-36.)   Plaintiff's gastrointestinal symptoms improved with medication and diet modifications.  (Tr. 25-27, 30 ,709, 712, 780, 789, 1304-05.)  Plaintiff's fractured wrist and shoulder healed with conservative treatment. (Tr. 27-28, 684, 687, 731-32, 824.)  Plaintiff admitted to good benefit with the use of Naproxen.  (Tr. 28-29, 852.)  Plaintiff was prescribed but declined physical therapy for his knee and left shoulder impairments.  (Tr. 22, 24, 27, 29, 511, 514.)  In November 2019, plaintiff received a left shoulder cortisone injection. (Tr. 29, 978-79.)  In the same month, he was seen for neck pain and only physical therapy was recommended for his mild symptoms. (Tr. 980, 983.)

Plaintiff received behavioral health counseling from December 2017 to June 2018 and did not seek specialized mental health treatment again until after the initial administrative hearing.  (Tr. 30, 938.)  His sessions focused on financial difficulties and family deaths.  (Tr. 615, 617, 626, 628, 639.)  Plaintiff reported improvement in his mental health symptoms with the use of medication.  (Tr. 23-25, 622, 629, 635, 704, 709-10.)  In fact, plaintiff reported improvement in his mental health and claimed he had returned to work in October 2018.  (Tr. 26, 32, 709.)  The medical record contains no evidence of hospitalizations for mental impairments.  If a claimant's pain is controlled by treatment or medication, it is not considered disabling.  *See Cypress v. Colvin,* 807 F.3d 948, 951 (8th Cir. 2015).  Plaintiff's improvement with conservative treatment is inconsistent with disabling impairments.  *See Lawrence v. Saul*, 970 F.3d 989, 996 (8th Cir. 2020) (ALJ's conclusions as to the severity of pain and limitations consistent with fact that claimant was prescribed generally conservative treatment).

The ALJ also considered that the objective findings were overwhelmingly normal or mild.  Cardiovascular testing did not show any significant abnormalities.  (Tr. 22, 26, 29, 562, 582, 641, 775, 805.)  A February 2018 left shoulder x-ray showed normal joint space. (Tr. 24, 506, 511.)  The same month, bilateral knee x-rays showed small bilateral effusions.  (Tr. 24, 507, 514.)  A February 2019 right wrist x-ray showed a fracture that subsequently healed.  (Tr. 27, 684, 697, 722.)  A

right shoulder x-ray showed an impaction fracture of the greater tuberosity that also healed. (Tr. 27, 684, 687, 877, 886.)  A May 2019 right shoulder ultrasound revealed a tendon tear, but plaintiff refused recommended surgery because he wanted to travel to Jordan and instead received an injection.  (Tr. 28, 887-88.) Plaintiff did not return to Dr. Doerr until six months later. (Tr. 977.)  October 2019 left shoulder x-rays demonstrated mild acromioclavicular joint osteoarthritis.  (Tr. 29, 978.)  Cervical x-rays in November 2019 were normal.  (Tr. 29, 982, 984.)  The medical evidence of record also supports the ALJ's findings and was properly considered by the ALJ as one factor when assessing plaintiff's credibility and evaluating his subjective complaints.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (noting that "lack of objective medical evidence is a factor an ALJ may consider.").

In his credibility determination the ALJ also properly considered plaintiff's failure to stop taking statin medications as advised and his refusal to have surgery for his right shoulder tendon tear because he was traveling internationally. (Tr. 28, 123, 888.)  Plaintiff also refused the recommended physical therapy for knee pain. (Tr. 514.)  An ALJ may properly consider a claimant's failure to follow prescribed treatment when evaluating the claimant's credibility.  *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (holding that "an ALJ may properly consider the claimant's . . . failing to take prescription medications [and] seek treatment . . . .").

34

The ALJ also properly considered evidence that plaintiff was exaggerating his symptoms to his healthcare providers, as plaintiff's treating physician, Dr. Meyer, found plaintiff's complaints of pain "out of proportion" to the physical examinations.  (Tr. 28, 31, 732, 853.)  *See Lawson v. Colvin*, 807 F.3d 962, 966 (8th Cir. 2015) (ALJ entitled to draw conclusions about claimant's credibility based on psychiatrist's observation that she was exaggerating symptoms); *Jones v. Astrue*, 619 F.3d 963, 972-73 (8th Cir. 2010) (ALJ entitled to draw conclusions about claimant's credibility based on physician's noted dramatic and possibly contrived anxiety).

The ALJ also determined that plaintiff's daily activities were inconsistent with his testimony and claimed limitations.  In his function report, plaintiff stated that he lived with his family and spent a typical day sitting on the couch and taking medication.  (Tr. 399.)  Although he stated that he did not prepare meals, do household chores, or drive, he did not claim that he was unable to perform these chores.  (Tr. 399-405.)  In fact he later admitted that he was capable of driving, managing his personal care, taking medication without reminders, walking, shopping weekly for groceries, managing his finances, watching television, paying attention without limitation, finishing what he started, following both written and spoken instructions, getting along with others, and handling changes in his routine. (Tr. 399-405.)  At the hearing plaintiff testified that he goes to the gym three days

a week.  (Tr. 132.)  Plaintiff also claimed at the hearing not to speak or understand

English, although his medical records reveal that he was able to communicate with

multiple doctors in English and only required an interpreter on a few occasions.

(Tr. 32.)  Dr. Bennett noted that plaintiff was "fluent in English" during his

February 21, 2019 visit.  (Tr. 789.)  At his initial consultation with Dr. Kumar on

November 14, 2019, plaintiff indicated that his "preferred language is English."

(Tr. 981.)  Here, the ALJ was not required to fully credit all of plaintiff's assertions

regarding the limitations given the medical evidence of record, the inconsistencies

in his testimony, the fact that he traveled internationally to Jordan, and that he

reported returning to work in October of 2018.  "The inconsistency between

[plaintiff's] subjective complaints and evidence regarding [his] activities of daily

living also raised legitimate concerns about [his] credibility." *Vance v. Berryhill*,

860 F.3d 1114,1121 (8th Cir. 2017).

In this case, the ALJ evaluated all of the evidence of record and adequately

explained his reasons for the weight given this evidence in a manner consistent

with the new regulations.  Good reasons and substantial evidence in the record as a

whole support the ALJ's RFC determination, so I will affirm the decision of the

Commissioner as within a "reasonable zone of choice." *Fentress v. Berryhill*, 854

F.3d 1016, 1021 (8th Cir. 2017) (citing *Owen v. Astrue*, 551 F.3d 792, 798 (8th

Cir. 2008)).

Because substantial evidence on the record as a whole supports the ALJ's RFC determination, the decision of the Commissioner must be affirmed.

## Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Id.* Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. *Id.*; *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016); *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011).

For the reasons set out above, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that plaintiff was not disabled. Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed. *Davis,* 239 F.3d at 966.

Accordingly,

**IT IS HEREBY ORDERED** that that the decision of the Commissioner is affirmed, and Hatem Jawad Obaid's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 12th day of September, 2022.